UNITED STATES of America,
Plaintiff-Appellee,

v.

Irving LIEBLICH, Defendant-Appellant.

No. 295, Docket 24075.

United States Court of Appeals
Second Circuit.

Argued April 12, 1957.

Decided July 9, 1957.

---

Paul W. Williams, U. S. Atty. for the Southern District of New York, New York City (Robert W. Bjork and Robert Kirtland, Asst. U. S. Attys., New York City, of Counsel), for plaintiff-appellee.

Vine H. Smith, Brooklyn, N. Y. and Daniel H. Greenberg, New York City, for defendant-appellant.

Before CLARK, Chief Judge, and MEDINA and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

The one-count indictment in this case charged appellant together with three co-defendants, Jacob Goldfless, Henry Mayer and Arthur Muller, and two other co-conspirators, Bernard Weit and Alvin Messler, with conspiracy to violate the Gold Act, 12 U.S.C.A. § 95a, Executive Order No. 6260, as amended, 12 U.S.C.A. § 95a note, and the Regulations issued and promulgated thereunder. The charges against the other defendants were severed and appellant was tried alone. The jury found him guilty and he appeals.

The factual background presents a simple question of veracity between the Government witnesses Weit, Messler and another man named Louis Lazar, on the one hand, and appellant on the other. Weit, of the firm of Weit & Macnow, Inc., had a license for the purchase of gold bullion in quantity. He testified that he and Messler, of the Jerral Watch Co., formed a partnership on a 50-50 basis to sell fine gold to appellant, who had no license, that between June 23 and November 24, 1950 he had about 70 transactions with appellant, who bought from him during this period about $400,-000 worth of 24-carat fine gold for cash, at an advance over the official price, which represented the profit to Weit and Messler. Weit would negotiate a sale with appellant, then purchase the gold from Kastenhuber & Lehrfeld, Inc., pursuant to his license, and then make deliveries at various places to appellant, who paid him in currency. Messler filled in additional details and testified to handling a number of sales to appellant while Weit was away on vacation in August or September, 1950. Certain books and records were produced and Weit described how these transactions were handled to conceal what he and Messler were doing. The cash would be deposited in the account of Jerral Watch Co., a check would be delivered to Weit & Macnow, Inc., and a series of entries made to give the transactions a fictitious appearance of legitimacy. As Messler testified, "we used the watch company as a cover-up for the sale of gold." Lazar testified to a number of additional sales of fine gold by him to appellant and to the details of delivery, payment and so on. Much is made of the fact that these witnesses were wrongdoers, and various contradictions and impeaching circumstances are brought to our attention, but there was an abundance of proof to warrant the submission of the case to the jury and it was the function of the jury to pass upon the credibility of the witnesses and decide whether to believe appellant, who vigorously denied the charge in toto.

The federal authorities became interested as a result of a particular transaction, which led to the arrest of Weit and appellant by the New York City police, and a considerable part of the record before us has to do with the events preceding and following this arrest.

Weit's version of this transaction is that on November 22, 1950 he negotiated a sale of 460 ounces of fine gold to appellant, that Weit purchased this from Samuel Landau and appellant resold it to Goldfless. Shortly thereafter, Goldfless discovered that the package delivered to him contained "junk" and he demanded

the immediate return of the $16,500 or thereabouts that he had paid to appellant for the "gold." Landau in the meantime had disappeared. The result was that Goldfless called the police, Weit and appellant were placed in the Tombs prison on November 24, and they spent the night there. In due course the case wound up in a New York City Magistrate's Court, where the charges were dismissed upon the payment of $14,000 by Weit to Goldfless. It was the claim of the prosecution in the case now before us that in the midst of the events of November 24, Goldfless got the happy thought that transactions in fine gold were illegal and they had better say it was platinum. In any event, appellant testified that he was dealing in platinum at the time, that "the mastermind who made the metal" was Messler and not Landau, and that, instead of being a transaction concerning 460 ounces of fine gold at about $36 an ounce it was a sale of 200 ounces of platinum, the sale of which without a license was not prohibited by law, at about $80 an ounce, on which appellant was to receive a commission of 20 cents an ounce.

It would be tedious to follow the testimony concerning the November transaction, and will suffice, we think, to mention that police officer McLain testified that the package weighed 490 ounces, the Government expert Elmer Thomas testified that the average selling price of platinum in November, 1950 was $91 per ounce, and, when appellant sued Goldfless for $100,000 for false arrest appellant's complaint made no mention of gold or platinum but alleged that Goldfless requested appellant to obtain for him "a certain quantity of precious metal" and that appellant informed Goldfless he could obtain 460 ounces "of said precious metal" at $35.90 per ounce, including a commission of 10 cents an ounce for appellant.

The grounds urged for reversal are many and various. We are told: (1) that the records showing the fictitious transactions between Weit & Macnow, Inc. and Jerral Watch Co. do not measure up to the requirements of the Business Records Act, 28 U.S.C. § 1732, and hence were not admissible; (2) that appellant was denied a proper opportunity to show lack of criminal intent; (3) that the conduct of the trial judge was so improper and prejudicial as to deprive appellant of a fair trial; and (4) that it was error to receive over appellant's objection the testimony of the witness Gruner in rebuttal. There are other contentions but we think they require no comment.

■■ As to the books and records, which were objected to on the ground that a "proper foundation has not been laid as yet" and that they were irrelevant "until such time as a conspiracy is shown," it is enough to say that Weit had already testified with a wealth of detail to the existence of the conspiracy and appellant's participation therein. The Business Records Act has nothing to do with the case before us, even if Weit did testify that the books and invoices were kept in the regular course of business. We are dealing here with the apparatus and paraphernalia of a criminal conspiracy, the devious devices resorted to for purposes of concealment. It is of no moment that appellant had nothing to do with the making of the entries. He may well not have known of their existence. But he was shown to be a participant in an illegal venture and what is done or said by the other co-conspirators in furtherance of the conspiracy is admissible against him. Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593; Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790.

■ The gist of the point about the exclusion of evidence of a lack of criminal intent on the part of appellant is that after he testified before the Grand Jury in June of 1952 he went to South America and from there to Israel, where he first learned that he had been indicted, and, although the treaty between the United States and Israel did not permit his extradition, he came back voluntarily to defend himself against the charge of conspiring to violate the Gold Act. We are told by appellant that, although

the Government claimed that he had run away to avoid prosecution and that this evidenced a consciousness of guilt, cf. United States v. Sobell, 2 Cir., 244 F.2d 520, the trial judge refused to receive his explanation. The difficulty with this contention is that it is in all respects completely refuted by the record. The first reference to this subject was by defense counsel on the cross-examination of Weit, this was followed by testimony by appellant on his own direct examination to the effect that after giving his testimony he was excused by the Grand Jury, that on July 29, 1952 he went to South America and from there to Israel, that he was in Tel Aviv in March 1953, when he first learned of the indictment and returned after being told that he did not have to return. Indeed, the Government conceded that under the terms of the treaty appellant could not have been extradited. The plain fact of the matter is that he brought up the issue himself and gave all the testimony that would have been relevant had the prosecution raised it. He was stopped only when he started in on a digression to the effect that he was offered a position with the Israel Government and had a letter with him to prove it. This was properly stricken.

Except as above noted this whole line of proof was received without objection, and the prosecutor naturally made the most of it. He brought out on appellant's cross-examination that appellant knew the nature of the investigation the Grand Jury had entered upon and that he was one of the persons whose conduct "was being inquired into," and that with such knowledge appellant went to South America. The claim that he went on a business trip was pretty well battered after it appeared that he did no business there.

▪ Finally, and still on the point of alleged exclusion of evidence of lack of criminal intent, on appellant's redirect examination the trial judge refused to permit appellant to testify to a conversation had with the Assistant United States Attorney in charge, after appellant had concluded his testimony before the Grand Jury. This is urged as a separate ground for reversal. Probably appellant would have been allowed to answer the question but for the fact that, prior to the statement of any objection, appellant began his answer with the words "he threatened me," and there was every indication that he was about to launch upon another of his long self-serving outbursts, about which more will be said in a moment. In any event, assuming that evidence by way of explanation for his leaving the country was admissible in the absence of prior proof by the prosecution of a flight showing consciousness of guilt, the explanation had already been given. Appellant had testified on his direct examination, and was allowed to repeat it on redirect, that after his testimony before the Grand Jury he was excused. In appellant's words, "I was excused and I went home and they left me alone." Under these circumstances it was clearly not an abuse of discretion to rule out the alleged conversation with the Assistant United States Attorney who was conducting the Grand Jury investigation.

Accordingly, as appellant at all times denied that he had any transactions with respect to the purchase and sale of gold bullion or fine gold with anyone at any time, it is clear to us that there was no improper exclusion of any evidence of a lack of criminal intent. On the contrary, much evidence of doubtful relevancy tendered on this subject by appellant was received without objection, and the net result was far from favorable to appellant.

▪ At first blush one or two excerpts from the transcript of the trial proceedings appear to indicate comments by the trial judge of doubtful propriety. Here again, however, the record as a whole discloses appellant as a recalcitrant, difficult and evasive witness, whose constant digressions, interruptions and long irresponsive self-serving appeals for sympathy must have sorely tried the patience of the trial judge. At the very beginning of his testimony on direct examination, and not in response to any question

even remotely relating to the subject, appellant made reference to a heart attack he said he had suffered while in South America. An objection was made and the court held the subject irrelevant and ruled it out. This did not have any effect whatever on appellant, however, who returned to the subject of his heart attack again and again. Finally, as appellant returned once more to the subject, the trial judge remarked, "Let us have all the hory-gory details then about the heart attack"; and defense counsel moved for a mistrial. There was a similar motion when the trial judge, after another series of equivocations and irrelevant self-serving statements by appellant, made reference to the fact that he had testified that he had studied law in Vienna and ought to know better.

Some notion of what the court and counsel had to contend with may be had from the following colloquy between appellant and his counsel:

"Defense Counsel: Mr. Lieblich, will you permit me to defend you to the best of my ability and keep your mouth shut.

"The Witness: Okay.

"Defense Counsel: Please."

We can find nothing in the entire record to justify the criticisms of the conduct of the trial judge. He was patient throughout, and was more tolerant of appellant's conduct than might have been expected under the circumstances. Whatever unfavorable impressions the jury may have had concerning appellant were of appellant's own making.

The defense in substance was that appellant was a dealer in platinum, not gold, and this subject was introduced by defense counsel on the cross-examination of Weit, the first prosecution witness. A very considerable part of appellant's testimony on direct examination was devoted to an attempt by him to explain the Goldfless transaction as relating to a sale of platinum and not, as claimed by Weit, a sale of 460 ounces of fine gold. What Max H. Gruner testified on rebuttal, after an objection by appellant's

counsel had been overruled, was that, after discovering that the metal delivered by appellant was not gold, Gruner at the suggestion of Goldfless, told appellant that in case he was afraid the sale of gold would make trouble he could say he sold Goldfless platinum "and try to straighten the whole thing out."

 This was quite proper as rebuttal; the defense had introduced the claim that the sale was of platinum. And, even were this not so, the trial judge has a wide discretion in permitting the introduction of evidence in rebuttal which might well have been brought out in the Government's case in chief.

Affirmed.