UNITED STATES of America,
Plaintiff-Appellee,

v.

Joe QUONG, Joe Wing Fong and
Joe Wing Wah, Defendants-
Appellants.

Nos. 14347–14349.

United States Court of Appeals
Sixth Circuit.

May 31, 1962.

Frank W. Oliver and Melvin B. Lewis, Chicago, Ill., for appellants.

Warner Hodges, U. S. Atty., Memphis, Tenn. (Herbert J. Miller, Jr., Asst. Atty. Gen., Crim. Div., Dept. of Justice, Washington, D. C., Eli Slotkin, Sp. Representative, New York City, on the brief), for appellee.

Before MAGRUDER and O'SULLIVAN, Circuit Judges, and DARR, District Judge.

DARR, District Judge.

Joe Quong and his two sons, Joe Wing Wah and Joe Wing Fong, appellants, with others besides, were accused in the first five counts of a thirteen-count indictment with five separate conspiracies, each charging an agreement to violate the Trading With the Enemy Act and regulations thereunder[1] and to violate the statute making it unlawful to knowingly import merchandise contrary to law.[2] Two counts (VII and VIII) charged Joe Quong with the substantive offense of violating the Trading With the

---

1. 50 U.S.C.A.Appendix § 5(a) and (b), Title 31, Code Federal Regulations, Chapter V, sub-title B, § 500.101 et seq.

2. 18 U.S.C.A. § 545.

Enemy Act at two different times; two counts (VI and IX) charged Joe Wing Wah with the same substantive offense at separate times; one count (VII) accused Joe Wing Fong with violating the Trading With the Enemy Act; and Lun Fee Lee was one of the accused in count V of the indictment as a conspirator and was charged in count XIII with importing merchandise into this country contrary to law.

Only the appellants and Lee were the accused at the trial. Lee was acquitted; the appellant Fong was acquitted of the charge in the substantive count (VII) but convicted of the five conspiracy counts (I–V); and Joe Quong and Joe Wing Wah were convicted on all charges against them.

The Trading With the Enemy Act was made a law during the time of World War I, since which time several amendments have been added. This law provides that the President is authorized, by direct action or through a designate, to make regulations for carrying out the purposes of the Act. The Act is effective during war or a national emergency.

During the course of the United States' action in Korea, in combat with Chinese Communists, the President of the United States declared an emergency. The President delegated to the Secretary of the Treasury certain powers to implement the Act in accord with its terms. On December 17, 1950 the Secretary promulgated and issued the Foreign Assets Control Regulations, which prohibit any dealings by persons subject to the jurisdiction of the United States, in any manner, direct or indirect, with Communist China. Among the prohibited goods listed in the Regulations is "Drugs, Chinese type." The purpose of the Regulations being to deprive the Chinese Communists of all economic advantages accruing from trade with the United States and the availability of United States dollars.

The law against smuggling, among other things, makes it illegal to fraudulently or knowingly import or bring into the United States, any merchandise contrary to law, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

It might be here noted that the indictment sets out the merchandise transported in violation of the Trading With the Enemy Act and Regulations thereunder to have been Chinese-type drugs.

The proof, to be more particularized hereinafter, submitted to the jury reveals the transactions by the appellants and others to have been as follows:

The life of the conspiracy was between November 1, 1956 and October 1, 1958. In the transactions hereafter recited the appellants used various fictitious names, particularly Joe Quong used the name Joe Wilson.

Quong and his family, including the two sons here involved, lived in Chicago, Illinois, at the beginning of the conspiracies. On May 1, 1957, Joe Quong and his son Joe Wing Wah appeared in Memphis and established a base of operation. Quong's other son, appellant, Joe Wing Fong, remained active in a firm called Sing Lee Company, 743 W. North Avenue, Chicago, Illinois, where he, under the name of Fong Wing, received much of the merchandise in question from other points and made shipments to Quong and Wah at 1240 Florida Street, Memphis, Tennessee. Quong and Wah made arrangements with a warehouse to receive merchandise and bank accounts were opened. Joe Quong had a store building on Florida Street in Memphis with a sign on the front window "Joe Wilson—Teas and Dried Vegetables," which was used as a front for dealing in Chinese-type drugs. Quong had also arranged for warehouses in other cities for the storage of "Chinese products, Chinese food."

In Vancouver, British Columbia, Canada, were housed Gold City Estates, Ltd. and Kuo Seun Importers, Ltd., both named co-conspirators in the indictment. These organizations were affiliates, Seto Gock being the principal officer. Other

import organizations in Vancouver with which appellants had dealings were Kam Yeu, Ltd. and a firm called Yeun Fong. To these organizations in Vancouver, there came from the Orient Chinese-type drugs which were thereafter transported by Canadians cross-country to points in Canada across the border from Niagara Falls, New York and from Detroit, Michigan. This merchandise entered the United States without complying with the law and thereafter moved to where they ultimately came into the possession of the appellants, or some of them in Memphis and Chicago.

Quong had a circular showing a list of his products, identified by witnesses for the government and one witness for the appellants as listing Chinese-type drugs. By this circular and otherwise these Chinese-type drugs were sold to various retail outlets. These drugs were ordered by appellants, principally Joe Quong, from or through the Gold City Estates, Ltd.—Kuo Seun organizations in Vancouver and less amounts from the other organizations in that city.

Payments for the purchases of the merchandise and for expenses of transportation and storage were made by checks and drafts signed in the most part by Joe Quong, but some of them were signed by Joe Wing Wah and some by Joe Wing Fong. On the expense items an example is, Harry Chad and Emil Buchamer were paid $15,723.77, principally for smuggling the goods into this country. There was a total of some eighty-six (86) bank checks and drafts issued for the purposes mentioned and the sum of the amounts thereof was $111,723.77.

The operations by the Canadians and these appellants were underhanded and reflect conniving with each other.

The proof offered in connection with the conspiracy and the proof to sustain the substantive counts against Quong and Wah covered the subject of venue.

1. The appellants did not testify for themselves and the proof offered for defense was negligible.

The trial of this case consumed ten trial days. Exhibits amounting to about fifteen hundred sheets of paper were introduced in evidence.

As the appellants did not introduce appreciable proof in defense of the accusations against them, their complaints here are the assertions of reasons why the government had no case or made no case against them.

The record discloses that at the trial there were a flood of objections on the part of appellants' attorneys to the admissibility of evidence, the competency of evidence, the conduct of the Trial Judge and the United States Attorney and to the Judge's charge. These objections are generally incorporated into some twenty-five questions under the heading "Statement of Questions Involved" and offered as reasons why the judgments should be reversed.

2. The appellants declare that the government had no case against them to start with because (1) the words "Chinese-type drugs" in the Regulations are meaningless and that the Regulations are void and (2) that the indictment contained the words "Chinese-type drugs" and that these words are meaningless, and thus there was no legal accusation against them.

These objections go to the substantive counts and to the portion of the conspiracy counts charging intent to violate the Trading With the Enemy Act.

The witness John Hong Hall testified that he was the third generation dealing in Chinese drugs in Chinatown, San Francisco. He had in the courtroom a number of packages of the merchandise he had received from appellant Quong and testified as to each package, stating they were traditionally and historically Chinese drugs or Chinese-type drugs and in many instances gave the ailment for which the drug was used. He further said that when the Regulation pertaining to the importation of this type of merchandise was first published, the Chinese papers carried big headlines with the story that such type merchandise

could no longer be legally imported. He further said that after the Regulations came out Chinese-type drugs were unavailable in the United States and he knew they could not be imported; that he knew the drugs he bought from Quong were imported, but that he did not think he was violating the law by purchasing the drugs after they were brought into the United States.

Mrs. Lapierre, connected with the Great Western Freight Forwarders, Ltd., Brantford, Ontario, Canada, testified that she found in a damaged package of the merchandise in question and in other cartons, which she opened, such things as seeds, roots, salve, liquids and small packages of powder wrapped in paper on which were instructions in Chinese figures.

The appellants, particularly Quong, had lists of merchandise for sales purposes which were identified by witnesses familiar with China and its traditions as listing Chinese-type drugs. Likewise these witnesses testified that the substances described by Mrs. Lapierre as being found in the cartons were also Chinese-type drugs.

■ An indictment or a regulation employing words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them is good and valid. Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322.

From the proof, it is quite evident that Chinese people, including these appellants, and anyone else interested in dealing in such commodities, well knew the meaning of the term "Chinese-type drugs" when it appeared in the Regulations. Obviously the appellants knew what these words meant when advised of the charge in the indictment.

■ The Regulations are valid and the indictment is good.

In this connection and to settle another complaint, the definition of Chinese-type drugs, as given in the instruc-

tions to the jury, was in accord with the proof.

■ 3. Another claim made by the appellants is that there was no venue in the District Court at Memphis, Tennessee. There was competent proof that Quong and Wah purchased at, and mailed from, Memphis drafts in payment for the merchandise and for the services of some Canadian collaborators. This sets up venue both as to the conspiracy and as to the substantive offenses. 18 U.S.C.A. § 3237; United States v. Seagraves, 3 Cir., 265 F.2d 876; United States v. Cohen, 3 Cir., 197 F.2d 26.

■ 4. Another reason assigned for reversing the judgments is that there was no allegation in the indictment or evidence of a foreign national or government having any interest in the proscribed merchandise.

The allegations in the indictment charged the offenses by citing the Act and Regulations which was notice to the appellants of the accusations.

The actual evidence revealed that many Canadian nationals, including warehouse people and carrier employees, had an interest in the forbidden goods. The term "any interest" must be defined in the broadest sense and includes any interest whatsoever, direct or indirect. United States v. Broverman, D.C., 180 F.Supp. 631, 636.

5. There is a claim of prejudicial error in the admitting of documentary evidence consisting of books and records of warehousemen, of carriers, of banks and of Kuo Seun.

A study of the record leads us to believe that the Trial Judge was not in error in admitting the government's records and the records from the warehousemen, carriers and banks. These were identified in substantial compliance with statutory provisions.

The admitting in evidence of the documents coming from the files of Kuo Seun should be discussed. These documents were obtained by a member of the Royal Canadian Mounted Police upon search warrant. The Mountie personally took

from the Kuo Seun files twelve empty envelopes addressed to "Kuo Seun and Gold City Company," showing on each the cancellation of the stamps to have been made in Memphis, Tennessee, and written thereon the return address "Joe Wilson, Florida Street, Memphis, Tennessee." Some of these letters were transmitted by air mail and some of them by registered mail.

The Mountie also procured from an officer of the Kuo Seun a ledger sheet or page showing the account kept with Fong Wing (this being an alias used by Joe Wing Fong); and also a number of shipping papers which involved the accused. All these documents came to the Mountie by reason of an arrangement made with an officer of the Company, who agreed to assemble them, whereby the Mountie could pick them up at a later time. The action of the Mountie and his testifying in the United States District Court came about through a treaty between the United States and Canada.

■ It would seem that these papers taken from Kuo Seun, by operation of law, could be introduced as being in substantial compliance with the Business Records Act [28 U.S.C.A. § 1732]. These were taken by the Mountie from the custodian of the records and the dates on the envelopes and the chronological dates on the ledger sheet, showing the account, were proven to correspond with orders and shipments. Thus taken all together, there is a showing that these records were kept in the regular course of business and filing of the envelopes and the entries made in the book or ledger sheet were about the time of the transactions. However, in any event, this documentary evidence was cumulative as there was proof of checks and drafts being mailed to Kuo Seun by appellants and evidence of shipments from Kuo Seun to points in Eastern Canada destined to appellants or some one of them. Some of the other record evidence was also cumulative.

We believe and conclude that the admission of the documentary evidence by the District Judge, charged as erroneous, did not visit any prejudice upon the appellants, nor "affect substantial rights" of the appellants. Rule 52(a), Federal Rules of Criminal Procedure, 18 U.S.C.A.; Gordon v. United States (C.A. 6), 164 F.2d 855, cert. den. 333 U.S. 862, 68 S.Ct. 741, 92 L.Ed. 1141; National Labor Relations Board v. Sharples Chemicals (C.A. 6), 209 F.2d 645; United States v. Lieblich (C.A. 2), 246 F.2d 890, cert. den. 355 U.S. 896, 78 S.Ct. 271, 2 L.Ed.2d 194; United States v. Bodnar (C.A.6), 248 F.2d 481.

■ 6. The appellants put forward the claim that the Trial Judge was in error in denying a mistrial upon the ground of an extra-judicial statement made by the government's witness John Hong Hall. Actually Hall gave the same testimony in open court as was in the statement. This contention has no merit.

■ 7. It is further said that reversible error was made when the Trial Judge brought out before the jury the fact that Hall had entered a plea of guilty to the substantive offense of violating the Trading With the Enemy Act. Apparently the Trial Judge asked this question so he could charge the jury on the value of the evidence of an accomplice. He did so in his charge and clearly cautioned the jury not to consider the fact that Hall had pleaded guilty, or that any other person had pleaded guilty, but to decide the case solely on the evidence adduced against the appellants. We see no prejudicial error in this.

■ And along the same line, the complaint is made of the statement of the United States Attorney that another person not on trial and who did not testify had entered a plea of guilty. The Trial Judge immediately ruled this out and repeated the ruling in his charge. We believe that this had no weight with the jury and is not reversible error.

8. Another reason advanced for a reversal of the judgments is that the proof was insufficient to warrant a conviction under the law pertaining to smuggling.

Also, it is claimed that the indictment did not charge smuggling but charged illegally importing merchandise and that

the Judge's instructions to the jury did not cover the charge in the indictment. The appellants make a contention that the word "smuggling" would only apply to the first paragraph of the law as found in the Criminal Code of the section entitled "Smuggling Goods Into the United States," [18 U.S.C.A. § 545] and not to the second paragraph providing for illegally importing or bringing merchandise into the United States.

██ This entire section of the Code pertains to smuggling and does provide that different acts would violate the law, but actually the entire section forbids smuggling, as announced by its subject, "Smuggling Goods Into the United States." The use of the word "smuggling" in the Judge's instructions to the jury was not harmful as he made special reference to the charge in the indictment and made explanation of the presumption of possession authorizing conviction.

We see no error in the Judge's instructions in this respect.

The further contention is made that there can be no presumption of guilt by reason of possession as provided by this law because the proof does not place the merchandise in the possession of the appellants.

Quong and Wah were convicted of the substantive offense of violating the Trading With the Enemy Act. Thus, their conviction under the conspiracy counts could well be sustained as a conspiracy to violate this Act. However, Fong was not convicted on the substantive count.

██ The law concerning smuggling goods into the United States contains a provision that possession, if unexplained, is sufficient to authorize conviction. But in this case it is not necessary to depend on possession of such goods because there are sufficient facts revealing that the merchandise was smuggled into the United States with knowledge on the part of the appellants. Mrs. Lapierre testified that Sidney Rock and Harry Chad, two coconspirators, at her warehouse in Brantford, Canada, in her back yard, arranged secret compartments in a large truck and in a small truck for the purpose of smuggling the merchandise in question across the border to Lee Young Enterprises in Niagara Falls, New York; that the goods actually moved out in these secret compartments; and that Sidney Rock said he was the Lee Young of the Lee Young Enterprises in Niagara Falls. A tie-in of the evidence disclosed that this very merchandise, by prearrangement, came into the possession of Quong and Wah in Memphis and Fong in Chicago.

Officials from the port in Detroit and the port in Buffalo (Niagara Falls) testified that there was no record of the forbidden merchandise passing through these ports during the critical time.

There is no direct proof of the smuggling from Canada to Detroit, but there is proof of a pattern of operations by the coconspirators and that quantities of the merchandise were shipped to appellants from Detroit under suspicious circumstances.

██ However, sufficient for the conviction is the direct proof of the smuggling of the shipments from Canada to Niagara Falls and appellants knowledge of and participation therein. In addition, the proof places the forbidden merchandise in the possession of the appellants and no effort was made to explain such possession. This in itself is sufficient to warrant conviction under the smuggling statute.

We conclude that there was substantial proof for the jury concerning violation of the law pertaining to smuggling and find no error in the Judge's instructions to the jury.

9. The contention is made that if the proof is sufficient to warrant a conviction for conspiracy, only count I is sustained.

Count I is the basic conspiracy and counts II–V charge the same conspiracy, the conspirators named being the same as those in count I, except in each count a purchaser of the drugs is added. The respective purchasers in these counts were John Hong Hall, Fong Quck Tip, Wong Shew Git and Lun Fee Lee.

John Hong Hall testified that he bought some of the merchandise from Quong, but understood it was not wrong to make purchases of such merchandise within the United States. Fong Quck Tip and Wong Shew Git did not testify. The only testimony affecting them was that checks were made or endorsed by Git and shipments had gone out to Git and Tip. Lun Fee Lee, the additional alleged conspirator in count V, was found not guilty.

The gravamen of a conspiracy is the *agreement* to commit the unlawful act. There is no evidence by which the jury could infer that these purchasers-conspirators were parties to any agreement to violate the laws named in the indictment. The sale and purchase of the merchandise could well be charged as an overt act against the other conspirators, and that only. Thus counts II–V are exactly the same as count I, except the addition of other overt acts. The appellants cannot be convicted five times on the same charge.

We believe that there was sufficient proof on only the conspiracy charged in count I. The result would perhaps not be reversible error as to the sentences received by Quong and Wah, but would affect the sentences placed on Fong. Quong and Wah received concurrent sentences of five (5) years on each conspiracy count. There was imposed on Fong concurrent sentences of five (5) years on counts I, II and III and five (5) years on counts IV and V, concurrent, the sentences on I, II and III and the sentences on IV and V were consecutive. These sentences imposed upon Fong being consecutive as to the conspiracy counts to a total of ten (10) years, would be an error of substance.

The District Judge should have sustained the appellants' motions for judgments of acquittal on counts II, III, IV and V of the indictment.

On the whole and considering the sufficiency of the evidence, Mr. Eli Slotkin, Special Representative, Foreign Assets Control, testified that he had made an investigation of the case and had compiled the information revealed by sundry documentary exhibits. He testified, that Joe Quong had issued thirty-six checks, and thirty-four drafts in payment of the merchandise and expenses; that these seventy checks and drafts totaled $102,-264.97; that Joe Wing Wah had purchased three drafts, totaling $5,506.00; that Joe Wing Fong had purchased three drafts, totaling $3,000.00; that the total checks and drafts for such payments amounted to $111,723.77 of which $72,-000.00 went to Seto Gock Gold City Estates or Kuo Seun in Vancouver, to Harry Chad and Emil Buchamer a total of $15,723.77, to Kam Yuen, Ltd., at Vancouver, $13,000.00, and to a firm called Yuen Fong, likewise at Vancouver, $1,-500.00, and that a number of checks and drafts were sent to two men, Lee Fun Chong and Gim Lee of Toronto, totaling $9,500.00. He set out minutely the shipments of merchandise which finally reached Quong and Wah in Memphis or Fong in Chicago. He also gave details concerning drafts issued by the Vancouver organizations which were endorsed in Hong Kong. He itemized the shipments coming to the appellants and going from them to retailers. He gave the total of the shipments to 1240 Florida Street or Vaiden's Warehouse in Memphis, Tennessee, as totaling one thousand eight hundred sixty-three parcels, weighing one hundred twenty-four thousand two hundred seventeen pounds.

Mr. Slotkin's testimony and other proof revealed that some of the shipments went this way: A large number of cartons of Chinese-type drugs, some marked as coming from the mainland of China, were shipped from Kuo Seun Importers, Ltd., 89 East Pender Street, Vancouver, Canada, by motor carrier (Gill Interprovincial Truck Lines) to Toronto, Canada, then from Toronto reshipped to Brantford, Canada, and stored with Great Western Freight Forwarders, Ltd.; that two trucks were prepared by Sidney Rock and Harry Chad in Brantford with secret compartments and the merchandise was smuggled by them

across the border to Niagara Falls, New York, to Lee Young Enterprises and from there shipped to Joe Wilson (Joe Quong) in care of Port Warehouses Inc., 47 Vestry Street, New York City and from there to Vaiden Warehouse Company, 699 South Main, Memphis, Tennessee, the warehouse used by Quong and Wah in Memphis. That other shipments were made by Fong Wing (Joe Wing Fong) from Chicago to Joe Wah Wing, 1240 Florida Street, Memphis, and to Joe Wilson (Joe Quong), 1240 Florida Street, Memphis. That Fong received in Chicago much of this merchandise, which was shipped out from Detroit at the instance of Emil Buchamer, one of the smugglers. That shipments were made of the forbidden merchandise from the Memphis address to the West Coast and Hawaii and New York. That many of the way bills of the shipments coming to appellants were marked "imported goods."

A full study of the entire record results in the belief that there was sufficient admissible evidence presented to the jury to sustain their verdict. Under these circumstances the jury verdict cannot be disturbed. However, the convictions on counts II, III, IV and V are excluded.

The judgments are affirmed, except as to counts II, III, IV and V and the judgments on these counts are reversed.

The case is remanded for action in accord with the views herein expressed.

O'SULLIVAN, Circuit Judge (concurring).

I concur in the opinion of Judge DARR. However, I do not wish such concurrence to be construed as expressing a conviction on my part that all of the numerous items of documentary evidence received in this case were sufficiently identified so as to justify their admission. It is not enough that records be merely found in the office of a particular company, or that someone testifies that such records are within his custody, to render them admissible under Section 1732, Title 28, U.S.C.A. In my opinion, some of the record evidence admitted was not sufficiently authenticated or otherwise rendered admissible. Such evidence, however, was cumulative and did not provide any of the essential links in the Government's case. The admission of such evidence and other rulings by the district judge, charged as erroneous, did not, in my opinion, visit any prejudice upon the appellants nor "affect substantial rights" of such defendants. F.R. Crim.P. 52(a).