**UNITED STATES of America, Appellee,**

v.

**Milton NUSSEN, Appellant.**

**No. 420, Docket 75–1231.**

United States Court of Appeals, Second Circuit.

Argued Nov. 6, 1975.
Decided Jan. 30, 1976.

Philip Peltz, Brooklyn, N. Y. (Carol Mellor, Brooklyn, N. Y., on the brief), for appellant.

Edward R. Korman, Chief Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (David G. Trager, U. S. Atty., and Gary A. Woodfield, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., on the brief), for appellee.

Before KAUFMAN, Chief Judge, and ANDERSON and MANSFIELD, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

Following a jury verdict of guilty, a judgment of conviction was entered against the appellant, Milton Nussen, for conspiring to possess and distribute the drug phentermine in violation of 21 U.S.C. § 841(a)(1).[1] The district court denied Nussen's motion for a new trial based on his claim of error in that the district court admitted into evidence certain of the appellant's post-arrest statements. This appeal followed. We affirm for the reasons stated below.

At the trial evidence was presented from which the jury could have found that Jerome Rudich, a confessed accomplice, told Nussen of a prospective purchaser's interest in buying approximately 11,000 tablets of phentermine. Nussen agreed to supply the drug and said he would leave it in his gold-colored 1970 Plymouth car[2] in a shopping center parking lot located just around the corner from Nussen's house. The transaction was arranged to take place on the night of July 16, 1974 at approximately 9:00 p. m. Prior to leaving for the shopping center, Rudich met Nussen at his, Nussen's home, and after Nussen drove off, Rudich waited about five minutes and then drove to the parking lot where he saw Nussen's car parked. Rudich then met with one Mark Risucci and John DiGravio, who, unknown to the others, was an agent of the Federal Drug Enforcement Administration. DiGravio paid the agreed purchase price of $2500 and Rudich took him to Nussen's unoccupied car, which they entered, and Rudich handed the pills from the back seat of the car to DiGravio who was in the front seat. Upon leaving the car, DiGravio signaled to Special Agent Falvey, who had been observing the activity, to arrest Risucci and DiGravio arrested Rudich. Rudich later named Nussen as his supplier, but Nussen was not arrested until December 17, 1974.

At the time of Nussen's arrest, Agent DiGravio gave him the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1968), and Nussen acknowledged that he understood them. Agents DiGravio and Falvey took Nussen to the Drug Administration Office for processing and he was again warned of his rights under *Miranda*. In the course of these procedures, without any suggestion, urging or request by the Special Agents, Nussen said that he wanted to cooperate.

---

1. Conspiracy to violate § 841(a)(1) is an offense under 21 U.S.C. § 846. The jury acquitted Nussen of two additional substantive counts under § 841(a)(1).

2. The car was registered in the name of Nussen's girl friend, but the appellant had use of it.

The agents expressed an interest in his doing so and in the course of the conversation which followed Agent DiGravio asked Nussen why he had reported to the police on the night of July 16, 1974 that his car had been stolen when he saw what was going on, when he was right there. Nussen replied that he had panicked when he saw what was going on; he knew that he had to cover himself, and the only thing he could think of was "to make like the car was stolen" or that it was not his. When Agent Falvey intimated to Nussen that he (Falvey) had seen him (though he actually had not) that night in the shopping center drug store, Nussen inquired, "Where in the drug store?" and Falvey said, "By the phone booth." Nussen exclaimed "Oh!" or "Oh my God."

As the conversation continued [3] and the agents were inquiring about the identity of Nussen's supplier, Nussen wished to know whether what he said at this time would be used against him to further develop a more encompassing case involving any drug dealings, and other transactions he had engaged in previous or subsequent to July 16, 1974. Agent DiGravio shook hands with the appellant and informed him that what he said about events occurring during those periods of time would not be used against him. DiGravio said the agents were now attempting to learn the source of supply of the 11,000 stimulant tablets, and that they were not interested in developing a tighter case on Nussen. Nussen then indicated that he was still on good terms with his supplier and that he could arrange another purchase with no difficulty. He admitted that his contact was in fact one Jerry Abrams of upstate New York.

Nussen further stated that he was in fact in the parking lot on July 16, 1974 and had seen the arrests take place and that he had reported his vehicle stolen in an attempt to give himself an alibi. He said he also considered the possibility of having a girl testify that she was with him on the night in question. He thought that the girl he had

in mind would be able to stand up under cross-examination as an alibi witness because she was an actress or person who worked in the theatre and would, therefore, have no difficulty.

On the Government's case in chief Rudich testified about Nussen's participation in supplying the phentermine and in its distribution and sale. He also told of a number of inculpatory admissions made by Nussen, including Nussen's efforts to avoid detection and, after the arrest of Rudich and Risucci, to formulate and establish an alibi. Special Agents DiGravio and Falvey testified to their activities during the sale of the drugs, the arrests of Rudich and Risucci, and, after the arrest of Nussen, giving to him the *Miranda* warnings as to his rights, learning of his expressed desire to cooperate with the Government, and hearing the inculpatory admissions made by him in connection with the offenses charged. No objections were made to the admissibility of this evidence presented on the Government's case in chief. On the Government's rebuttal DiGravio testified to his promise to Nussen, as stated above, that his disclosures to them would not be used against him as a basis for new, additional or enlarged charges for drug offenses.

The issue presently before this court is whether the trial court erred, following a suppression hearing decided in favor of the Government, in allowing the prosecution to introduce into evidence on its rebuttal, statements made by the appellant to the special agents after his arrest and after the agents had assured Nussen that such evidence would not be used as a basis for new and additional charges against him under the narcotics laws.

This issue started developing early in the trial. In his opening statement the counsel for the defense announced that the defendant would take the stand and testify in his own behalf. Shortly thereafter the Government let it be known to defense counsel that if the defendant did so, it would

---

3. Except for the third sentence of this paragraph, both this paragraph and the next following paragraph are speaking of the testimony of DiGravio made on rebuttal.

impeach his credibility by putting in evidence of admissions of guilt made by Nussen to the Special Agents. The Government pointed out it could do this under the authority of *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

Thereafter the defendant decided not to take the witness stand and did not do so. Instead, the defense offered as its only evidence the testimony of an alibi witness, one Romanelli, who testified that between about 7:45 p. m. and 9:45 p. m. on the evening in question, he was continuously in the company of Nussen a real estate agent, looking over various dwelling houses which Nussen had listed for sale. These hours covered all of the time within which the sale of the phentermine pills was made; and, if it were true that Nussen was thus continuously occupied in showing houses to Romanelli, Nussen could not have personally participated in delivering the pills to the shopping center parking lot and subsequently have observed the sale and arrests which took place there.

The Government was surprised by the alibi witness and his testimony. To meet it the Government decided to attack the credibility of the defense witness by bringing out Nussen's admission that, once he realized he would become a suspect, he planned to fabricate an alibi of one kind or another "to cover myself."

The defendant took the position that the promises made by the agents in working out Nussen's cooperation with the Government in seeking to get evidence of large scale suppliers of drugs, afforded Nussen a blanket immunity and that any use of any admission to the agents on the part of Nussen would have constituted a violation of his Fifth Amendment rights in contravention of the *Miranda* doctrine.

The Government argues that the understanding between the agents and Nussen for the latter's cooperation constituted no such blanket immunity and that "the agreement should not be construed 'to include the right to commit perjury' or put in a fabricated defense." It refers to *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), as governing these circumstances, either directly or by analogy. At the outset we must reject *Harris* as controlling authority. It had to do with a case in which the defendant himself had testified and his credibility was impeached by bringing out a prior inconsistent statement. In the present case the defendant did not testify and the evidence offered by the Government was not confined to impeachment of the credibility of the defense witness but was direct, substantive, evidence designed flatly to contradict the entire defense. The case is, therefore, fully distinguishable from *Harris.*

The Government, however, suggests that in this case we carve out an analogous doctrine to that in *Harris* to fit the circumstances of this case and thereby enlarge the exception to the *Miranda* warnings, by permitting the prior statements made by a suspect or accused to be used to show that the defense presented was wholly inconsistent with those statements. We decline, however, to adopt such a ruling in this case.

Following a discussion with counsel after the defense had rested, the district court, on motion of defense counsel, ordered that a suppression hearing be held on the question of whether or not the Government should be allowed to offer in rebuttal evidence which directly or by clear implication would contradict the alibi defense submitted by the defendant.

The issue at the suppression hearing resolved itself into a determination of the terms and effect of the oral understanding between the Special Agents and Nussen relative to Nussen's proffered cooperation with the Government in disclosing to the Government, evidence of suppliers and their acts of supplying substantial quantities of drugs.

The suppression hearing consisted entirely of direct and cross-examinations of Special Agent DiGravio and was directed to a detailed probing of the conversation between the Special Agents and Nussen which took place after Nussen had been given the

*Miranda* warnings for the second time and after Nussen, entirely on his own, stated that he wanted to cooperate with the Government. After a short discussion in which Nussen said that he was present at the parking lot on the night of July 16, 1974, that he had seen what was going on, including the arrests, and that he then decided to report that his car had been stolen, Nussen indicated some disquietude lest his revelations about substantial suppliers of drugs would entail admissions of additional violations of the drug laws on his part. Agent DiGravio told him that they were trying to begin a case against the supplier of the 11,000 pills, that they were not interested in delving into other incidents of drug-dealings by Nussen, and that what he said about them would not be used against him. At one point Nussen and Special Agent DiGravio shook hands to confirm that the agents were not trying to discover new or additional drug violations by him.

There was a lengthy cross-examination by defense counsel in which DiGravio was frequently asked to tell about the agreement with Nussen. Defense counsel, in his interrogation, reiterated and emphasized two of the statements made by DiGravio to Nussen, *i. e.,* "that nothing he said would be used against him" and "That this wouldn't be used to tighten up this case against him." They were quoted, however, in different contexts from that of the original use and they were repeated into the record by defense counsel as plenary statements of immunity, embracing any and all relationships between Nussen and the Government. When lifted out of context, the quoted statements may sound as if they had a general, all pervading application. But a consideration of these same utterances in the light of DiGravio's other testimony sur-

rounding each of them makes it clear that there was sufficient evidence to support the trial court's finding[4] that the understanding between Nussen and the Special Agent was that any disclosure made by Nussen would not be used to build a larger case against him; that is, the prosecution would not be enlarged, as DiGravio explained it, by "other narcotics transactions or other types of incidents that had occurred." The defendant offered no evidence to support a different version or interpretation of the understanding. Nussen himself had the opportunity to testify on the suppression hearing without any fear that what he said would be used to incriminate him. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

The defense's motion to suppress Nussen's admissions made after the agreement sealed by the shaking of hands became effective, was denied by the district court.

The court had made clear to the Government, the defense and to the members of the jury that the only evidence which could be used for rebuttal and considered by the triers was proof which directly or by clear implication contradicted the substance of the appellant's defense. The purpose of the Government's rebuttal was, therefore, to prove that contrary to the alibi testimony, Nussen was in or about the parking lot in the evening of July 16, 1974 during the time when the transfer of the drugs and the payment therefor was made and that he saw the arrests which followed, and consequently he could not have been in another part of the City with the Romanellis.

To show this, the Government recalled Special Agent DiGravio who again testified that Nussen had admitted that he was at

---

4. On June 20, 1975 when the trial court denied the defendant's motion for a new trial because of the use of these additional admissions as rebuttal evidence, he made the following statement from the bench:

   "Now, as I read that and as I read the surrounding parts of that testimony what Mr. DeGraffio [sic] was saying was that he made *no promise* that he [Nussen] would not be prosecuted or that anything he said would

   not be used in connection with the case as to which they already had him, so to speak, but that they wouldn't use anything he said to add to the case against him in terms of building or adding additional counts in the indictment that they already . . . [had] and indeed they didn't, they only charged him with just one violation and they used—they warned him not once but twice."

the parking lot at the time of the delivery of the illicit drugs, that he had observed what went on, including the arrests of Rudich and Risucci, and that he planned to formulate an alibi to cover himself by reporting his car stolen.

Agent DiGravio then testified to the circumstances of the understanding with Nussen concerning possible additional prosecutions against him by reason of disclosures of suppliers of substantial amounts of narcotics and associated incidents which may have involved Nussen; and that they shook hands on it. The agent described the essence of the understanding in connection with Nussen's proffered cooperation as follows:

"At this time Mr. Nussen questioned the fact of whether what he said at this time would be used against him to further develop a more encompassing case involving any drug dealings, and other transactions he had engaged in previous or subsequent to July 16, 1974. Mr. Nussen and I shook hands at this time. I informed him that what he said would not be used against him. That we were at this time attempting to further the case in order to reach the source of supply of the 11,000 stimulant tablets. That I was not interested in developing a tighter case on Mr. Nussen." Transcript April 14, 1975, 10:10 a. m., p. 333.

Thereafter Agent DiGravio told of Nussen's admissions: that Nussen did report to the police that his car had been stolen but that he had decided that this alibi would not be effective and that he was considering a new alibi in which a girl would testify that he was with her during the evening of July 16th. Nussen also stated that the pills had been supplied by one Jimmy Abrams who was employed by the Concord Hotel in upstate New York; that he was on good terms with Abrams and could arrange for another purchase from him. Nussen agreed to contact the agents concerning this after a few days and he was given the telephone number where Agent DiGravio could be reached, but no further contact was made.

■ No objection was made by the defendant that any portion of this testimony went beyond the scope of the defense or might well have been brought out in the Government's case in chief. Moreover, the trial court has a wide discretion over what evidence may or may not be presented on rebuttal. *United States v. Trapnell,* 495 F.2d 22, 25 (2 Cir.), *cert. denied* 419 U.S. 851, 95 S.Ct. 93, 42 L.Ed.2d 82 (1974); *United States v. Pomares,* 499 F.2d 1220, 1223 (2 Cir.), *cert. denied* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974); *United States v. Lieblich,* 246 F.2d 890, 895 (2 Cir.), *cert. denied* 355 U.S. 896, 78 S.Ct. 271, 2 L.Ed.2d 194 (1957).

■ The appellant's principal attack against the rebuttal is directed at Agent DiGravio's statement, above quoted, concerning the nature and terms of the understanding between Nussen and him, on which they shook hands. The appellant argues that this was a grant of use immunity which was used to coerce Nussen into making, involuntarily, the admissions which were used in the present case. The appellant overlooks the fact that the agent's statement on rebuttal of that understanding, which Nussen does not dispute, *excludes* "drug dealings and other transactions" which took place or occurred on July 16, 1974, the date of the offense charged in the present case and the only date of the unlawful acts mentioned in the admissions. The statement of the understanding goes on to say, "drug dealings and other transactions he had engaged in *previous* or *subsequent to* July 16, 1974," but not *on July* 16, 1974, the very day on which the offense was committed. (Emphasis supplied.) If any immunity was granted, it did not include events of July 16, 1974. Thus we find that no promise of immunity was made to Nussen by the agents that would encompass the admissions used against him in the present case. The district court's denial of Nussen's motion to suppress those statements, therefore, was correct.

The underlying issue in a case of this kind is whether or not the admissions were free and voluntary or coerced and involun-

tary. *United States v. Pomares, supra.* The thrust of the appellant's assertion is that his admissions were the result of coercion and were, therefore, involuntary, but there is not in the record of this case a single bit of evidence to justify a charge of coercion and nothing to show or even imply that the admissions he made were involuntary. Nussen was never asked to say anything. His offer to cooperate with the Government (presumably in regard to gathering or offering proof in his own case) was entirely his own idea and was spontaneously advanced by him alone.

This court declared in *United States v. Ferrara,* 377 F.2d 16, 17 (2 Cir.), *cert. denied* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967), that:

"[T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . .' *Rogers v. Richmond,* 365 U.S. 534, 544, [81 S.Ct. 735, 5 L.Ed.2d 760] (1961) . . ."

Nussen was twice given the *Miranda* warnings the second time just before beginning the conversation in which his admissions were made. His conversation with the agents did not exceed 10 minutes of time. In the discussion of what cooperation by Nussen would mean, the Agents said they wanted to know the source of the 11,000 pills and whether Nussen could arrange another buy from the same source. He assured them there would be no problem in making such an arrangement, and that the supplier was "Jimmy Abrams." The agents said they could make Nussen no promises but told him that they would inform the Assistant United States Attorney of Nussen's intention to cooperate and he would decide. This type of promise has been held by this Circuit not to constitute coercion. *United States v. Pomares, supra,* 499 F.2d at 1222.

There was never the slightest suggestion that Nussen was subjected to any threats or physical abuse or like duress; nor was he subjected to lengthy interrogation or any of the other compulsive pressures which would constitute mental coercion, as lucidly set forth in *United States ex rel. Lewis v. Henderson,* 520 F.2d 896, 900–901 (2 Cir. 1975). See also *Cobbs v. Robinson, Warden, Connecticut State Prison, Somers, Connecticut,* 528 F.2d 1331 (2 Cir. 1975).

In short, it would be difficult to conceive of circumstances of an arrest and subsequent admissions or confessions by an accused to the police officers in which the admissions or confessions were more freely self-determined. There was not a scrap of evidence that the Government agents even attempted to overbear Nussen's will to resist, if he had any, let alone accomplish it. Having twice given Nussen the *Miranda* warnings, and having heard him express his desire to cooperate with the Government, the agents were free to discuss the case with him, advise him how he could cooperate and the advantage which might result to him if he did so. The agents said or did nothing which was unfair or overreaching. They fully comported with the letter and spirit of the decision of the Supreme Court in *Miranda.* See *United States v. Pomares, supra.* We find no merit in any remaining claims by the appellant.[5]

The judgment of conviction is affirmed.

---

5. Even if, for other reasons, the trial court should have excluded the rebuttal testimony, an affirmance of the judgment of conviction would still be called for because we are satisfied that, if the district court committed error in admitting the statements into evidence, it was harmless.

The rebuttal testimony added little or nothing to the Government's case. Its case in chief presented overwhelming evidence to the jury of Nussen's guilt. Rudich, a close friend and accomplice of Nussen's, testified that he called Nussen to tell him he had an order for 10,000 to 11,000 phentermine pills from Risucci; and that the prospective purchaser would like samples. Rudich's testimony told of Nussen providing samples of the pills for the prospective purchaser; Nussen's agreement to handle the order for 11,000 pills; Nussen's plans and arrangements for the delivery of the pills; his taking them in his car to a shopping center parking lot and leaving the car, unoccupied but with the pills by the back seat; and how Rudich, in

MANSFIELD, Circuit Judge (dissenting):

The record in this case is crystal clear that a government agent (DiGravio), believing that he already had enough evidence to convict appellant (Nussen), who was then under arrest and indictment for conspiracy to possess and distribute a controlled substance in violation of 21 U.S.C. § 846, asked appellant to furnish information that might lead to the arrest and conviction of his source. When appellant expressed apprehension lest a statement given by him might be used to build a larger case against himself the agent, instead of refusing any assurance or giving Nussen a qualified assurance, granted him blanket immunity from the use against him of any self-incriminating statement that he might make. According to Agent DiGravio's own testimony, this immunity took the form of assurances to appellant (1) that the agent "was not interested in developing a tighter case on Mr. Nussen" (Tr. 333); (2) "that what he [Nussen] said would not be used against him" (Tr. 333); (3) "that we weren't interested in his cooperation to further this case . . . and that we were not now interested in any of his past conduct" (Tr. 299–

carrying out Nussen's plan for the sale of the pills, acted as go-between in collecting the sale price and pointing out the location of the pills to Risucci and DiGravio (then acting as undercover man). Rudich also testified to a conversation he had with Nussen just outside Rudich's house after Rudich and Risucci had been arrested. On that occasion Nussen wanted to know if Rudich had given his (Nussen's) name to the investigators. Rudich said he had not. Nussen said he had seen the whole thing and had reported his car stolen an hour later. Nussen also said he had been in Dial drug store, then across the street and thereafter he kept on walking because he got scared. Sometime later Rudich told Nussen he would have to testify against him and Nussen said he understood and would have "to get an alibi—a good lawyer and an alibi." Nussen asked Rudich if the agents had found *the extra 100 pills* (emphasis supplied) in the vent of Nussen's car, and Rudich said he didn't know. [Actually, Agent Falvey testified that right after the arrests, he found the "extra" hundred pills in a bag on the floor in front of the driver's seat of Nussen's car when Falvey was looking for the car key, but he knew nothing then of who owned the car or who may have owned the pills. This is corroborative evidence of Nussen being the supplier of the pills, and it could be properly inferred that "the extra" meant "extra" to the 11,000 pills of the transaction.]

Agents DiGravio and Falvey testified to statements made by Nussen to them prior to the hand-shaking understanding. Nussen said he wanted to cooperate with the Government. He admitted he was present at the parking lot on the night of July 16, 1974. He said he didn't know what to do, he panicked. He admitted he saw what was going on and he knew that he had to cover himself. The only thing he could think of was "to make like the car was stolen" or that it was not his. All of this evidence came in before the jury with no objections of any moment, and the defense case did not attack it, except to claim the alibi that Nussen was not there at all during the night of July 16, 1974, although he several times admitted he was there and "had seen the whole thing."

This evidence introduced by the Government on its case in chief, and prior to the hand-shaking agreement, was ample, standing by itself, to support a conviction.

The admissions, made by Nussen after the hand-shaking agreement, and for the most part testified to on rebuttal, were largely reiterations of what had been put in evidence on the Government's case in chief. Nussen admitted that he was in the parking lot in the evening of July 16, 1974; that he saw the arrests; that he went to the nearest police station and reported his car stolen in an attempt to provide himself with an alibi to the effect that the car was used but that he had nothing to do with it. Nussen told the agents that that alibi had fallen through and that he was thinking of making a new one in which a girl would testify that he was with her on the night in question.

A newly added piece of information was that the supplier's name was Jerry Abrams, who was employed at the Concord Hotel in upstate New York. These small additions to the evidence already before the jury, were hardly calculated to affect the jury's thoughts about the case one way or the other. The jury must have inferred from the Government's main case that Nussen had acquired the pills from some source. Under the circumstances it is entirely beyond belief that the added information of the name and location of that source, would have modified or strengthened its view of the case.

Assuming, therefore, that this rebuttal evidence or some of it should have been excluded, "the record clearly reveals that any error in its admission was harmless beyond a reasonable doubt." *Milton v. Wainwright,* 407 U.S. 371, 372, 92 S.Ct. 2174, 2175, 33 L.Ed.2d 1 (1971).

300); (4) that "[w]e were at this point, moving onto the next potential defendant . . . that we were not working on him as a defendant, but at this time moving ahead attempting to break the case to the next higher stage" (Tr. 299–300); and (5) that "We were no longer working on Milton Nussen" (Tr. 321). It was only after receiving these assurances that Nussen furnished the self-incriminatory statements introduced by the government on rebuttal at trial.

It is elementary that the effect of a blanket immunity is to preclude the government from using against a defendant any resulting statements obtained from him. See *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897). The fact that he had been given warnings as prescribed by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), does not render his statement admissible against him in the absence of any showing that he "knowingly and intelligently" waived his right against self-incrimination before making the statement, see 384 U.S. at 479, 86 S.Ct. 1602.[1] In *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), Justice Harlan, speaking with respect to the admissibility of "evidence of guilt induced from a person under a governmental promise of immunity," stated the Court's view that "such evidence must be excluded under the Self-Incrimination Clause of the Fifth Amendment. . . Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official phys-

ical or psychological coercion." 371 U.S. at 347–48, 83 S.Ct. at 453.[2]

The majority seeks to circumvent application of the foregoing basic principle by holding that the immunity given by agent DiGravio to appellant was limited to other cases that might be developed through use of appellant's statement and did not extend to the existing case against him. The difficulty with this position is that, despite extended examination of Agent DiGravio on the subject, both at the suppression hearing and at trial, in the course of which the idea of a limited immunity was suggested, he was never willing to state unequivocally that he had limited the promises given by him to Nussen. Although the record reveals that Nussen was initially concerned about the possibility that his statement might be used to develop "a more encompassing case" against him, it is equally clear that the agent, apparently in the belief that he had already developed a solid case against Nussen and in the desire to ease any fears that Nussen might have regarding the consequences of his cooperation, promised blanket rather than limited immunity. In this way, of course, the agent avoided the risk of losing the opportunity to obtain evidence that might incriminate the "higher-ups."

In concluding that DiGravio's promises of immunity did not extend to this case, the majority relies heavily on the following excerpt from Agent DiGravio's testimony:

"At this time Mr. Nussen questioned the fact of whether what he said at this time would be used against him to further

---

1. Agent DiGravio testified that he did not offer any written waiver form for defendant to sign, even though the Drug Enforcement Administration does have such forms for use by agents, if they so desire. Agent DiGravio stated that it was his practice never to use such a written waiver. I do not rely on the absence of a written agreement concerning the extent of immunity, since a *Miranda* waiver need not be written, see *United States v. Cassino,* 467 F.2d 610, 620 n. 30 (2d Cir. 1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 590 (1973), but prudence might well dictate that when police officers make such complicated agreements of partial immunity as the government argues was intended in this case, the agree-

ments be reduced to writing to avoid any subsequent complications.

2. Our decisions in *United States v. Pomares,* 499 F.2d 1220 (2d Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974), and *United States v. Ferrara,* 377 F.2d 16 (2d Cir.), *cert. denied,* 489 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967), do not cast any doubt on this rule. Both cases involve only promises to, or expectations by, a defendant that cooperation with the police might provide some benefits, such as the possibility of release on bail. There was no hint in either case that the police offered use immunity to the suspect.

develop a more encompassing case involving any drug dealings, and other transactions he had engaged in prior to or subsequent to July 16, 1974. Mr. Nussen and I shook hands at this time. *I informed him that what he said would not be used against him.* That we were at this time attempting to further the case in order to reach the source of supply of the 11,000 stimulant tablets. *That I was not interested in developing a tighter case on Mr. Nussen.*" (Tr. 333) (Emphasis added).

This testimony hardly offers clear support for the majority's interpretation of Agent DiGravio's statement. Although appellant's expression of concern that a statement given by him would be used to develop a "more encompassing case" against him might be interpreted, though not necessarily, as referring only to other transactions, the agent's sweeping assurances went much further, indicating an attempt to ease any fears appellant might have that his cooperation with the government could get him into any further trouble. Furthermore this testimony of Agent DiGravio was not made at the suppression hearing at which Judge Platt denied appellant's motion to exclude any testimony about these statements, but in the course of Agent DiGravio's later testimony in open court, after repeated but unsuccessful efforts had been made to elicit from the witness a limitation upon the assurances that had been given by him to Nussen.

An examination of the testimony actually given by Agent DiGravio at the suppression hearing indicates even more clearly that he made an absolute offer of immunity which would extend to the present prosecution. When first asked by the prosecution at the suppression hearing to describe his conversation with appellant, DiGravio replied as follows:

"Q. Will you please tell us the circumstances and how these statements arose?

A. During the processing of Milton Nussen as I stated the other day, he made certain admissions which I mentioned. Then, there came a time during the processing after he had already stated that he wanted to cooperate with the United States Government, he became a little hesitant as most defendants do wanting to know that we weren't going to build a larger case on him and whether what he was going to say *would put him in more jeopardy than he was already in.*

I assured him that *we weren't interested in his cooperation to further this case* and to get to the source of the 11,000 stimulant tables [sic] and *that we were not now interested in any of his past conduct.* We were at this point, moving on to the next potential defendant. At that time, I shook hands with Milton Nussen in a gesture that *we were not working on him as a defendant,* but at this time moving ahead, attempting to break the case to the next higher stage." (Tr. 299–300) (Emphasis added).

This initial account by Agent DiGravio of the conversation with appellant cannot support the conclusion that he carefully limited his assurances of immunity as the government now claims he did. Rather, it is clear that the agent and the suspect had reached an understanding that the prosecution in the present case would be carried on with the evidence already in hand, and that Nussen could talk without any apprehension that his statements would put him in greater jeopardy in this or any other case. After further suppression hearing testimony on direct examination about the nature of the help which appellant might give the government, cross-examination ensued, during which DiGravio specifically testified that he told Nussen that nothing he said would be used against him. The phrase piqued the curiosity of the trial judge, who then himself questioned Agent DiGravio, seeking to determine whether the promise of immunity was limited as the government claimed:

"The Court: . . . When you said, as I believe you said on cross-examination at one point that the statements that he made, the further statements that he made were not going to be used against him. Was that made in the context 'not going to be used against him' in this case

or 'not going to be used against him' in building a larger case as you heretofore indicated?

"The Witness: I meant it that what he said in—

"The Court: Not what you meant in, what context as the statement.

"The Witness: The context was made that what he said would not be used against him *to develop an entire case* or a larger case. It would not be used to drag in other narcotic transactions or other types of incidents that had occurred.

"What we needed from him was assurance that he in fact could help us to further this case to get to the source of supply." (Tr. 319–20) (Emphasis added).

It is difficult to imagine how the trial judge could have posed a question which more clearly raised the issue now before us. Yet Agent DiGravio's response once again indicates that his offer of immunity was not limited, but rather extended to the use made of the testimony in the present case.

Under further cross-examination, Agent DiGravio expanded upon his answer to Judge Platt's question, and again indicated that he gave broad assurances of immunity to appellant. Moreover, his testimony to this effect does not seem to have been wrung from him by insistent or confusing questioning by defense counsel, but rather was freely offered:

"Q. You just told Judge Platt what you claimed the context of the statement was. That it would not be used to tighten the existing case against this defendant; is that correct?

"A. I also stated more than that. I said to enlarge, to entrap the individual, where he felt as though we were still working on him. We were no longer working on Milton Nussen." (Tr. 321).

Taken as a whole, the record does not support a finding that Agent DiGravio assured appellant only that his statements would not be used in prosecutions for other criminal offenses. On the contrary, it clearly indicates that DiGravio made a blanket promise of immunity to appellant which induced his subsequent statements. Even

if there were ambiguity as to the meaning, it should be resolved in appellant's favor. Thus the use of Nussen's statements at trial violated his Fifth Amendment privilege against self-incrimination. See *Miranda v. Arizona, supra,* 384 U.S. at 469, 86 S.Ct. 1602; *Shotwell Mfg. Co. v. United States, supra,* 371 U.S. at 347–48, 83 S.Ct. 448.

The government also contends that, while the use of these statements on its direct case might have violated appellant's Fifth Amendment privilege, the prosecution's use of them to rebut defendant's alibi witness is nonetheless permissible, by analogy to *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). See also *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). The reasoning advanced in support of this position is that if such statements can be used under *Harris* and *Hass* to impeach a testifying defendant, they should be similarly available to counter possible perjury by an alibi witness testifying for the defense. I concur in the majority's rejection of this attempt to create a new exception to the requirements of *Miranda.* First of all, the statements in question were admitted for substantive use in determining the appellant's guilt, not merely for the limited purpose of impeaching credibility, which is the only purpose permitted by *Harris,* see 401 U.S. at 225–26, 91 S.Ct. 643, and *Hass,* see 420 U.S. at 722, 95 S.Ct. 1215. Secondly, the *Harris-Hass* doctrine requires that such statements may be so used only if they would have been admissible under pre-*Miranda* standards. See 420 U.S. at 723, 95 S.Ct. 1215. The statements made by appellant in response to a promise of immunity would not have been admissible even prior to *Miranda.* See *Shotwell Mfg. Co. v. United States, supra*; cf. *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897). See also Maguire, Evidence of Guilt 139 (1959); *Developments in the Law—Confessions,* 79 Harv.L.Rev. 935, 954–61 (1966).

Moreover, the *Harris* and *Hass* decisions only allow such uses of statements taken in violation of *Miranda* as will not provide any significant incentives for police officers to

violate the *Miranda* guidelines. See *Oregon v. Hass, supra,* 420 U.S. at 723, 95 S.Ct. 1215; *Harris v. New York, supra,* 401 U.S. at 225, 91 S.Ct. 643. The view of the *Harris* court that allowing such statements to be used to impeach a testifying defendant does not provide such incentives to ignore *Miranda* has itself been criticized by some commentators, see Dershowitz and Ely, *Harris v. New York: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority,* 80 Yale L.J. 1198, 1218–21 (1971), and if such statements were also useable as the government here suggests, insignificant incentives to disregard *Miranda* would almost certainly arise. Police officers would be tempted to violate *Miranda* guidelines in order to obtain incriminating statements from a suspect which could then be used as a lever not only to keep him from testifying on his own behalf, see *id.,* but also to prevent him from offering any defense at all since, if he offered such a defense, the incriminating statements could then be used in rebuttal. In short, the "exception" to *Miranda* which the government here advocates would swallow the rule.

Finally, I must dissent from the majority view that the error concerning the admission of appellant's statements were harmless. Nussen, it should be remembered, was convicted only on the conspiracy count; the extent of his participation in the transaction thus was a crucial issue for the jury's consideration. Aside from the admissions erroneously admitted, all of the testimony implicating Nussen as the man who arranged to provide the pills came from Rudich, an alleged co-conspirator, and a witness whose credibility was open to serious question because of the benefits he hoped to obtain from cooperation with the government, his criminal record, and his use of drugs. None of the admissions by Nussen properly introduced on the government's direct case corroborated Rudich's story about Nussen's central role in the transaction; they indicated merely that Nussen had been on the scene that night, had panicked and falsely reported his car stolen.

By contrast, Nussen's later, erroneously introduced admission that the pills were supplied by one Jerry Abrams, who worked at the Concord Hotel in upstate New York, directly corroborated Rudich's story that Nussen was a member of the conspiracy, indeed a key link in the chain of distribution of the pills. Moreover, the erroneously introduced admission by Nussen that he planned to procure a false alibi witness went far toward undercutting the testimony of the alibi witness he did introduce who, if believed, would have exculpated him from any direct part in the parking lot transaction. Indeed, the fact that the government felt it desirable to introduce these later admissions may imply that it had some qualms about the strength of its case at that point. Thus, in view of the fact that the erroneously introduced admissions both materially strengthened the government's evidence on whether Nussen was a member of the conspiracy, and undercut Nussen's alibi I am not satisfied beyond a reasonable doubt, as *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), requires, that the error was harmless.